ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL IV

| | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br><br>Peticionario<br><br>v.<br><br>LUIS JABRIEL IRIZARRY LÓPEZ<br><br>Recurrido | TA2026CE00187<br><br><br><br><br>Consolidado con | *CERTIORARI* procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Civil Número: ISCR202300856 AL ISCR202300860<br><br>Sobre: Arts. 6.05, 6.09 y 6.22 Ley 168; Arts. 401 y 412 Ley 4 |
| EL PUEBLO DE PUERTO RICO<br><br>Peticionario<br><br>v.<br><br>ADOLFO VÁZQUEZ SÁEZ<br><br>Recurrido | TA2026CE00189 | Civil Número: ISCR202300851 AL ISCR202300855<br><br>Sobre: Arts. 6.05, 6.09 y 6.22 Ley 168; Arts. 401 y 412 Ley 4 |

Panel integrado por su presidenta, la Jueza Ortiz Flores, el Juez Bonilla Ortiz y la Jueza Martínez Cordero

Ortiz Flores, jueza ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 16 de abril de 2026.

Comparece ante nos El Pueblo de Puerto Rico, por conducto de la Oficina del Procurador General de Puerto Rico (Ministerio Público o el peticionario), mediante *Petición de Certiorari* y nos solicita la revisión de una *Resolución* emitida el 6 de octubre de 2025 y notificada el 7 de octubre de 2025, por el Tribunal de Primera Instancia, Sala Superior de Mayagüez. Mediante el referido dictamen, el foro primario declaró *Ha Lugar* una supresión de una evidencia.

Por los fundamentos que expondremos, **expedimos** el recurso de *certiorari* solicitado y **revocamos** el dictamen apelado.

**I**

Por hechos acaecidos el 24 de marzo de 2023, y luego de varios incidentes procesales, el Ministerio Público presentó *Acusación*[1] contra el señor Adolfo Vázquez Sáez y el señor Luis Jabriel Irizarry López (la parte recurrida) por violaciones a los Artículos 6.05, 6.09 y 6.22 de la Ley Núm.168-2019, según enmendada, mejor conocida como *Ley de Armas de Puerto Rico* (Ley Núm. 168-2019), 25 LPRA sec. 466d, 25 LPRA sec. 466h, 25 LPRA sec. 466u; los Artículos 401 y 412 de la Ley Núm. 4 del 23 de junio de 1971, según enmendada, mejor conocida como la *Ley de Sustancias Controladas de Puerto Rico* (Ley Núm. 23-1971), 24 LPRA sec. 2401, 24 LPRA sec. 2412; y al Artículo 3.23(A) de la Ley Núm. 22 de 7 de enero de 2000, según enmendada, mejor conocida como la *Ley de Vehículos y Tránsito de Puerto Rico* (Ley Núm. 22-2000), 9 LPRA sec. 5073. Los referidos artículos tipifican, respectivamente, los delitos de posesión, portación y uso de armas de fuego sin licencia; portación de municiones sin licencia; uso ilegal de la licencia de conducir; posesión de sustancias controladas y parafernilia.

Posteriormente, el 29 de enero de 2024, la parte recurrida presentó *Moción de Supresión de Evidencia*.[2] Adujo que la *Declaración Jurada*[3] que sirvió de fundamento para la expedición de la Orden de Registro y Allanamiento emitida en su contra fue obtenida ilegalmente, al derivar del testimonio del Agente Herminio Sánchez Ramos (agente Sánchez Ramos) que, a su juicio, resultaba insuficiente en Derecho. A tenor, solicitó que se celebrase un avista de supresión de evidencia para la evaluación de la prueba de cargo y la legalidad de los arrestos.

Por su parte, el 7 de febrero de 2024, compareció el Ministerio Público mediante *Moción Informativa Relacionada a Solicitud de Supresión de Evidencia*.[4] Sostuvo que el testimonio ofrecido por el agente Sánchez

---

[1] Sistema Unificado de Manejo y Administración de Casos en el Tribunal de Apelaciones (SUMAC TA), a la Entrada Núm. 1, Anejo 3.
[2] *Id.,* al Anejo 4 y 5.
[3] *Id.,* al Anejo 13, págs. 3-4.
[4] *Id.,* al Anejo 6.

Ramos no fue uno estereotipado y que, por el contrario, no adolecía de contradicciones, lagunas ni vaguedades. Por lo cual, solicitó al foro primario que declarase *No Ha Lugar* la supresión solicitada.

Así las cosas, el 21 de enero de 2025 y el 1 de octubre de 2025, el Tribunal de Primera Instancia celebró la Vista de Supresión de Evidencia. En la misma, el foro primario admitió como prueba documental presentada por el Ministerio Público lo siguiente: (i) *Exhibit 1 – Foto*;[5] (ii) *Exhibit 2A-2E - Fotos*;[6] (iii) *Exhibit 3 – Certificado de Examen Sección de Armas*,[7] y (iv) *Exhibit 4 – Certificado de Análisis Laboratorio*.[8] Asimismo, el foro primario tomó conocimiento judicial de la *Orden de Registro y/o Allanamiento*.[9] A su vez, desfilaron los testimonios del agente Sánchez Ramos y del Agente Flerin Albino Acosta.

Sometido el caso, el 6 de octubre de 2025, el foro primario emitió *Resolución*.[10] Mediante el referido dictamen, concluyó que la defensa logró rebatir la presunción de legalidad y razonabilidad de la actuación gubernamental, por consiguiente, la evidencia ocupada producto de la intervención era inadmisible ante el Tribunal. A tenor, declaró *Ha Lugar* la supresión de evidencia solicitada. Asimismo, el foro primario realizó las siguientes determinaciones de hechos:

1. El agente Sánchez Ramos declaró que el 24 de marzo de 2023 se encontraba laborando como motociclista en la División de Patrullas Carreteras de Mayagüez.

2. A eso de las 6:47 de la mañana se encontraba realizando una intervención en la carretera número 2 cerca del *Triangle Dealer* y el *Emporium*, en dirección de Hormigueros hacia Mayagüez. Cuando pudo observar un vehículo Toyota Corolla color gris, en el cual los ocupantes transitaban sin hacer uso del cinturón de seguridad.

3. Añade que los cristales delanteros del vehículo estaban abajo y tenía tintes indebidos en la parte posterior. El motivo de intervención fueron los cinturones de seguridad. A esa hora el flujo vehicular era lento.

---

[5] *Supra,* al Anejo 9.
[6] *Id.,* al Anejo 10.
[7] *Id.,* al Anejo 11.
[8] *Id.,* al Anejo 12.
[9] *Id.,* al Anejo 13.
[10] *Id.,* al Anejo 2.

4. El agente Sánchez Ramos le informa lo que había observado al sargento Duamel González Irizarry (González Irizarry), quien lo acompañaba. Ambos estaban en motora.

5. El sargento González Irizarry ya se había percatado que estaban sin cinturón, por lo que salió detrás de ellos para realizar la intervención.

6. El agente Sánchez Ramos estaba terminando con su intervención. Al concluirla, abordó su motora y salió detrás del sargento González Irizarry. Esto le tomó unos segundos, posterior a que partió el sargento. Es decir, básicamente lo que tardo en abordar su unidad.

7. Al salir detrás del sargento González Irizarry, se percata que el Toyota Corolla tomó el carril de la derecha y entró a la Avenida Hiram D. Cabassa. El sargento también dobló hacia esa avenida. Cuando el agente Sánchez Ramos dobla, ya el sargento estaba bajado de la motora.

8. El agente Sánchez Ramos se estacionó y se bajó de la motora. Indica que los intervenidos se estacionaron a la derecha, en donde está el primer *show room* del *Triangle Dealer*.

9. El agente Sánchez Ramos procedió a acercarse al vehículo por el lado del pasajero, o sea, por el lado derecho. Cuando va caminando hacia el vehículo el sargento González Irizarry ya estaba más hacia el frente, es decir, más cerca del vehículo. El sargento se acercaba por el lado del conductor.

10. El sargento González Irizarry estaba entrando en la zona roja, que es la parte izquierda posterior lateral del vehículo. Éste le hace señas al agente Sánchez Ramos con las manos, como indicándole que había movimiento de manos dentro del vehículo. Pero ya el agente se había percatado que en efecto había un movimiento en el vehículo. El sargento no le verbalizó nada, solo le hizo un gesto con sus manos. Una vez observó al sargento hacer el gesto con sus manos, el agente le hizo señas con la cabeza de que sí, porque estaba viendo por el retrovisor del vehículo que el pasajero estaba en movimiento.

11. El agente Sánchez Ramos percibió los movimientos constantes y continuos como si ocultaran algo. Ante la insistencia, sintió temor y pensó podría ser un arma o algún material delictivo.

12. Posteriormente, el agente Sánchez Ramos se acercó un poco más hacia el área del pasajero, en el lado derecho. Cuando se acercó pudo percibir un olor a la sustancia controlada conocida como Marihuana.

13. En el momento que el agente Sánchez Ramos se percató del olor a Marihuana estaba pegado al vehículo, a menos de un pie de distancia. Indica que el olor a Marihuana que percibió era en su estado natural, lo categoriza como término medio y no era muy fuerte.

Una vez percibió el olor a Marihuana le hizo señas al sargento González Irizarry, como que le estaba dando olor y este último le indico con la cabeza que sí.

14. El agente Sánchez Ramos dice que luego de esto el sargento González Irizarry estaba hablando algo con el conductor del vehículo, pero no escuchaba la conversación. Estaba a una distancia del ancho de la capota del conductor y del sargento. El agente expresa que paso al lado del conductor, se identificó y le informo este el motivo de la intervención. El conductor resultó ser el acusado Vázquez Sáez.

15. El agente Sánchez Ramos le indicó al acusado Vázquez Sáez que el motivo de la intervención fue no utilizar el cinturón de seguridad y le solicitó los documentos correspondientes. Luego de explicarle el motivo de la intervención al conductor Vázquez Sáez, éste le dice que no tenía licencia de conducir.

16. Después de solicitarle los documentos al conductor, el sargento González Irizarry quien estaba por la parte de atrás le entregó un papel al agente Sánchez Ramos. Era el registro del vehículo que le había entregado originalmente el acusado Vázquez Sáez al sargento. El agente recibió el registro y lo verificó, no surgía ninguna ilegalidad de ese documento.

17. Mientras el agente Sánchez Ramo sostenía el documento, ambos ocupantes seguían moviéndose dentro del vehículo. El pasajero se movía hacia la parte frontal del asiento y volvía hacia atrás. El agente les solicitó que pusieran sus manos donde él pudiera verlas. El pasajero se reía como en forma de burla. Hasta ese momento el agente no había observado ninguna evidencia delictiva. En ese instante los acusados estaban acatando de cierta forma las instrucciones que les estaba dando.

18. En lo sucesivo los acusados vuelven a mover las manos de donde las tenían. El agente Sánchez Ramos entiende que al volver e insistir en mover las manos no seguían sus instrucciones. El acusado Vázquez Sáez las movía hacia el frente, como tratando de explicarle o queriendo hablar, aunque articulaba con las manos eso no era ilegal. Ahí decide bajar a ambos ocupantes del vehículo.

19. El agente Sánchez Ramos les da la orden de que se bajen del vehículo. Les explica que tenía los motivos fundados para creer que existía la presencia de sustancia controlada conocida como Marihuana en el interior del vehículo.

20. Al bajarlos del vehículo, ya tenía identificado al acusado Vázquez Sáez, porque había hablado con él relacionado a su identidad. Dentro de la conversación el agente Sánchez Ramos le había preguntado el nombre a este acusado y el mismo le dio el nombre correcto.

21. Cuando baja los ocupantes, ambos pasaron a la parte posterior del vehículo a solicitud del agente Sánchez Ramos. Éstos se bajaron voluntariamente cuando se les requirió. El pasajero se bajó y pasó a la parte posterior como se le solicitó, de igual forma lo hizo Vázquez Sáez.

22. Estando en la parte posterior, el agente Sánchez Ramos le preguntó al pasajero su nombre y este le pregunta – porque tenía que darle el nombre. El agente explicó que estaba comenzando un proceso de investigación, porque ya le había explicado que tenía los motivos para creer que existía la sustancia controlada en el interior del vehículo.

23. El pasajero resultó ser el acusado Irizarry López. Cuando observa inicialmente el vehículo este acusado no cometía delito alguno. Lo arresta por obstrucción a su labor, ello por no brindarle la información requerida. El agente Sánchez Ramos afirma que tenía que brindarla, debido a que él estaba comenzando una investigación en relación al vehículo donde se encontraba y tenía los motivos fundados para entrevistarlo (hacerle preguntas).

24. A preguntas de la defensa el agente Sánchez Ramos asevera, que había una contaminación general en el vehículo de la sustancia controlada en su estado natural. Pero no vio sustancias controladas, cigarrillos encendidos o fumados, *lighter* ni algún efecto o evidencia delictiva. Mencionó que estaba ocupando el vehículo para investigar, pues no tenía certeza y solicitó la orden para ver si había algo allí – por el olor percibido-.

25. Luego dice que fue antes de bajar a los ocupantes del vehículo, que les había explicado que tenía motivos para creer que existía la presencia de la sustancia controlada conocida como Marihuana en el interior del Toyota Corolla. También les explicó el procedimiento a seguir para solicitar una orden de registro y allanamiento, más lo que es el consentimiento a un registro. Ninguno de los acusados consintió el registro del vehículo. En ese momento no estaban bajo arresto o detenidos.

26. Una vez les explicó los procedimientos, el conductor Vázquez Sáez le verbalizó que estaba cumpliendo una probatoria, que no le hiciera daño. Al decirle esto y al ser un conductor no autorizado, le pregunto quién era su social y el estatus de la probatoria. En ese momento no les había hecho las Advertencias Miranda.

27. Le pidió información al acusado Vázquez Sáez previo a realizarle las advertencias de ley, aun teniendo motivos fundados para intervenir. Le preguntó quién era la social que tenía, con relación a la probatoria. El acusado Vázquez Sáez ya le había dicho que tenía unos 5 años aproximados por cumplir.

28. El agente Sánchez Ramos le requirió esta información con el propósito de confirmar si lo que Vázquez Sáez

le decía era cierto o no. A su entender, esta información era importante para saber quién era la socio penal mientras realizaba la intervención en la carretera. Porque el acusado Vázquez Sáez estaba en la posible comisión de un nuevo delito estando bajo unas condiciones. El acusado Vázquez Sáez le dio la identidad de la social.

29. En ese momento puso a Vázquez Sáez bajo arresto, ante la sospecha de la comisión de nuevo delito. No lo puso bajo arresto por alegadamente haber percibido el olor a Marihuana en el vehículo, sino por la comisión de un nuevo delito estando bajo las condiciones de una probatoria. El nuevo delito era conducir o hacer funcionar un vehículo de motor sin estar debidamente autorizado por el Secretario de Transportación y Obras Públicas, Articulo 3.23 A de la Ley de Tránsito. Expresa que arresta a Vázquez Sáez por haber cometido un delito menor en su presencia.

30. También arrestó al otro pasajero del vehículo, al acusado Irizarry López. Antes de realizar el arresto no se había corroborado la presencia de Marihuana en el vehículo ni en posesión de los acusados. En ningún momento el agente corroboró la presencia de Marihuana como parte de la intervención.

31. El agente Sánchez Ramos indicó que se arrestaron a ambos acusados. Él puso las restricciones a Vázquez Sáez y el sargento González Irizarry arrestó al pasajero Irizarry López.

32. Como parte de ese arresto se realizó un registro incidental o cacheo a Vázquez Sáez y no se le ocupó ninguna evidencia delictiva.

33. Al momento de arrestar y sellar el vehículo, el agente interventor no había observado la presencia de alguna evidencia delictiva. La razón por la cual selló el vehículo fue para tramitar una orden de registro y allanamiento ante un Juez.

34. No llamó al K9 por la hora de la intervención, más entendía no era necesario.

35. El agente Sánchez Ramos explica que el procedimiento que realizó para obtener la orden de registro y allanamiento en contra del vehículo fue el siguiente: les informa a los acusados que el vehículo iba a ser ocupado, una vez ocupó el vehículo lo selló -se inicia cada sello-, perpetuó en fotos lo realizado con la asistencia de la División de Servicios Técnicos y consultó con la Fiscal, a la cual le informó todo lo que había realizado en la investigación hasta ese momento. Añade, que una vez consulta con la Fiscal, es ésta quien toma la determinación de si autoriza o no a que se solicite la orden de registro y allanamiento, el agente solo sigue instrucciones.

36. El agente Sánchez Ramos indica que prestó una declaración jurada para acompañar la solicitud de orden de registro y allanamiento. La petición del

agente a la magistrado era que le expidiera una orden de registro porque se quería ocupar la sustancia controlada conocida como Marihuana.

37. La declaración jurada que acompañó la orden de registro y allanamiento indicaba que se había percibido olor a Marihuana dentro del vehículo y por lo tanto quería registrarlo para ocuparla.

38. La *Orden de Registro y/o Allanamiento* fue expedida por la Jueza Municipal Margarita Gaudier Lavergne el 24 de marzo de 2023. La orden daba la instrucción de ocupar la sustancia controlada conocida como Marihuana.

39. El agente Sánchez Ramos testifico que no participó ni estuvo presente durante el registro, además desconoce el día y la hora en que se hizo. El agente Albino Acosta fue quien diligenció la *Orden de Registro y/o Allanamiento.* Al momento de hacerse el registro no mantenía comunicación con el agente Albino Acosta.

40. Sin embargo, el agente Sánchez Ramos luego indica que esa tarde estaba en el área del Cuartel de Patrullas y Carreteras cuando se diligenció la referida orden.

41. El sargento González Irizarry había participado en la intervención. La Orden se le entrega al sargento y éste a su vez, la entrega al agente Albino Acosta. El agente Sánchez Ramos vio cuando la entregó.

42. Efectuado el registro del vehículo por conducto de la Orden y ulterior al diligenciamiento, el agente Sánchez Ramos habló en el Cuartel con el agente Albino Acosta. Quien le informó que no ocupó la Marihuana que él alegaba se encontraba dentro del vehículo. Por el contrario, ocupó una cartera, un arma de fuego, cargadores con municiones, balanza y sustancia controlada conocida como cocaína.

43. El agente Sánchez Ramos declaró que detuvo a las personas por el cinturón de seguridad, pero posteriormente el agente Albino Acosta realizó una prueba de tintes. Resultando de la misma que estaban excediendo el límite establecido por ley.

44. El sargento Gonzales Irizarry también observó que los acusados venían sin cinturones de seguridad y fue quien les ordenó detenerse. Sin embargo, él no fue quien le dio los boletos por falta administrativa.

45. El agente Sánchez Ramos indica que expidió boletos por las siguientes faltas administrativas: por los cinturones y los tintes. El motivo fundado de la intervención fueron los cinturones de seguridad.

46. El agente Sánchez Ramos refiere que encontrándose a un pie de distancia del vehículo cuando le dio el olor a Marihuana. Relata que no vio: ceniceros con cenizas, algún *lighter* o artefacto para encender fuego,

residuos de Marihuana, tampoco observó actividad u objeto ilegal alguno.

47. El agente Sánchez Ramos bajó a las personas del vehículo porque se movían, él entendía que este comportamiento suponía un riesgo.

48. La hora de la intervención fue a las 6:47 de la mañana, pero el agente interventor imprimió los boletos a las 8:26 de la mañana. No los preparo a la hora de la intervención, sino una hora y pico después.

49. Durante la intervención el agente Sánchez Ramos no percibió nada ilegal sobre los acusados. Cuando se desmontaron del vehículo no vio nada ilegal ni que indicare que había Marihuana.

50. La declaración jurada suscrita por el agente Sánchez Ramos lee: "*Una vez estos fuera del vehículo, les explicó, que tenía los motivos fundados para creer que existía la presencia de posible sustancia controlada conocida como marihuana en el interior del vehículo, y le explicó detalladamente el procedimiento para utilizar los mecanismos del estado, para solicitar una Orden de registro y Allanamiento, a su vez, le explicó, la PPR-612.1 Consentimiento a un Registro. Una vez les explicó esto, le preguntó si entendían, en donde no hicieron ningún tipo de manifestación, y donde el pasajero solo se reía. Al ver la negativa a contestar la pregunta, les informó que el vehículo serio sellado, además sería ocupado para solicitar una orden de registro y allanamiento. Una vez escucha lo explicado, el conductor manifestó de manera espontánea "coño oficial, yo estoy en probatoria". Al éste expresar su estado en probatoria, le preguntó sobre esta, y quién era su social, manifestando que le quedan 5 años por cumplir aproximadamente, y que su social es Elsie Crespo. Le preguntó los datos al pasajero, el cual se rio, no contestó, y le pregunta ¿por qué tengo que darte mis datos, si nosotros no hemos hecho nada? Vuelve a explicarle el proceso que estaban realizando, los motivos fundados, y sus derechos, y, aun así, éste se mostró poco cooperador. Procedió a arrestar los ocupantes, a ocupar, y cerrar el vehículo en cuestión.*"

51. De ese extracto de la declaración jurada no surge o dice que detuvo, arrestó o puso bajo custodia a Vázquez Sáez porque alegadamente había cometido una infracción al Artículo 3.23 de la Ley de Tránsito o porque estaba cometiendo un delito nuevo luego de su probatoria.

52. Una vez sella el vehículo, ya se constituye a una ocupación y les dijo que sería ocupado para buscar una orden de registro y allanamiento. Por lo que había percibido, no para investigar. Para verificar si había o no sustancia controlada. No conocía lo que había allí, no había visto ni confirmado nada.

53. El agente Sánchez Ramos dijo que selló el vehículo y también arrestó a Vázquez Sáez porque estaba cometiendo un delito, que era conducir sin licencia. El

agente primero declara que la declaración jurada no dice que ese fue el motivo para arrestarlo, que no los expreso así. Luego contesta que si lo dice.

54. El acusado Irizarry López era el pasajero, no tenía control ni manejaba el vehículo. El motivo de su arresto fue por obstrucción a la justicia, al ver su negativa porque no le respondió proveyendo su nombre y no podía identificarlo. Le pidió esta información en miras de que el vehículo iba a ser ocupado y podría ser citado ante la posible presencia de la sustancia controlada conocida como Marihuana. El acusado Irizarry López se reía y le cuestionaba al agente el por qué tenía que darle esa información.

55. Los acusados fueron trasladados al Cuartel de la Policía, Patrullas Carreteras en Mayagüez. Allí el agente investigador levantó los datos e información de los acusados para preparar el expediente. Les hizo las advertencias de ley.

56. Una vez ingresados en la celda procedió a solicitar una orden de registro y allanamiento. En esa Orden no menciona que haya visto nada ilegal. Pero solicitó a un magistrado que le permitiera buscar la sustancia controlada conocida como Marihuana. Aunque no la vio, aun cuando no explicó que tenía algún tipo de evidencia visual que indicará que efectivamente allí había algo delictivo.

57. Surge de la *Orden de Registro y/o Allanamiento* que la Jueza consignó lo que se iba a buscar. Debido a que la persona que la confeccionó no consignó que lo que se iba a buscar era Marihuana.

58. El Tribunal le ordenó registrar el vehículo marca Toyota, modelo Corolla, color gris, año 2015, tablilla INC-173, cuatro puertas. A manuscrito, la Jueza que expidió la Orden, hizo la siguiente nota: *en busca de la sustancia controlada conocida como marihuana*.

59. No se realizó la prueba de fotómetro a los cristales del vehículo en el lugar de los hechos. No se hicieron gestiones para traer un can de la policía ni para solicitar un personal especializado para trabajar con este caso para así poder determinar efectivamente lo que sospechaba. Asegurando el agente Sánchez Ramos que esto no era necesario.

60. El agente Albino Acosta declaró [el] que 24 de marzo de 2023 se encontraba en la División de Patrullas Carreteras. Él diligenció la *Orden de Registro y/o Allanamiento* dirigida a un vehículo marca Toyota, modelo Corolla, color gris, año 2015, tablilla INC-173. A manuscrito, la Jueza que expidió la orden, hizo la siguiente nota: *en busca de la sustancia controlada conocida como marihuana*. Esta fue la instrucción, para lo que se autorizó a la policía.

61. La orden se le entregó al sargento González Irizarry junto al compañero Sánchez Ramos. Luego de corroborada la Orden, el agente Sánchez Ramos le

identifica las personas que estaban envueltas en dicha Orden, las que tenían el carro, que eran Irizarry López y Vázquez Sáez, quienes estaban en la celda de la división. Desconoce por qué razón lo arrestaron.

62. Los remueven de la celda y el agente Albino Acosta les indica las advertencias de ley, las cuales también se le entregaron por escrito. Además, les enseña la *Orden de Registro y/o Allanamiento.* Realizado esto, proceden a salir de la división al lugar en donde se encontraba estacionado el vehículo a registrar.

63. El vehículo se encontraba cerrado, tenía los sellos, cuando se abrió no le hicieron la prueba de los tintes, a lo que al agente Albino Acosta le respecta. Él no lo hizo y no recuerda si alguien lo hizo.

64. Una vez en el vehículo y estando ambos acusados presentes, empezaron a registrar por el área del pasajero frontal en donde no se ocupó nada ilegal. Luego pasan a la parte posterior del área del pasajero, donde en el piso se podía observar una cartera color negra y parte de una pistola. Se veía y cuando ocupa -coge- sale más el arma de la cartera. Al corroborar, era una pistola color negra con un aditamento. Asimismo, dentro de la cartera se ocupó cocaína en modalidad de crack, unos cargadores con municiones, una balanza digital y varias bolsitas plásticas. Continuando con el registro alrededor del vehículo - baúl y lado izquierdo- no se ocupó nada más en cuanto a sustancias controladas o armas de fuego.

65. El vehículo lo había ocupado el agente Sánchez Ramos, ningún agente del orden público le había mencionado una cartera que estuviera a plena vista. Pero cuando el agente Albino Acosta registró el vehículo la cartera estaba a plena vista. Destaca que los cristales del vehículo al momento del registro estaban subidos y eran obscuros.

66. Revisado minuciosamente el vehículo en ninguna parte encontró la sustancia controlada conocida como Marihuana, que era lo que indicaba la Orden.

67. El agente Albino Acosta realizó el rastreo del arma y la entregó al Instituto de Ciencias Forenses para su análisis. Resultó ser capaz de disparar en automático "*full-auto*". Tenía un aditamento para disparar en automático. En cuanto a los acusados, no tenían licencia para poseer armas de fuego.

68. Cuando diligencia la orden con relación al vehículo, el agente Albino Acosta menciona que una vez abrió el vehículo pudo percibir un fuerte olor a Marihuana en el interior. No recuerda en qué estado.

69. Cuando diligenció la Orden le acompañaba el sargento Torres Masa, el compañero de Servicios Técnicos (quien tomó las fotos de la evidencia ocupada y del vehículo intervenido) y el agente Sánchez Ramos.

70. Se admitió una foto en donde se estaba haciendo la prueba de tintes a un cristal del vehículo, el cual arrojó un 12 por ciento. Luego de ver la foto, el agente Albino Acosta alega que recuerda que se realizó en su presencia, es que ha transcurrido algún tiempo desde la intervención.

Inconforme con el dictamen, el 22 de octubre de 2025, el Ministerio Publico instó *Moción en Reconsideración a Supresión de Evidencia*.[11] Por su parte, el 1 de diciembre de 2025, el señor Vázquez Sáez compareció mediante *Moción en Oposición a Reconsideración de Resolución de Supresión de Evidencia*.[12] Dado lo anterior, el 3 de diciembre de 2025, el Tribunal de Primera Instancia emitió una *Resolución*.[13] Mediante el referido dictamen, el foro primario declaró *No Ha Lugar* la reconsideración solicitada.

Posteriormente, el 16 de enero de 2026, el foro primario emitió una *Resolución*[14] mediante la cual denegó la solicitud de reconsideración respecto al recurrido, el señor Irizarry López. Aun inconforme, el 17 de febrero de 2026, el Ministerio Público comparece ante nos mediante recurso de *Petición de Certiorari*,[15] y plantea la comisión de dos errores por parte del foro primario, a saber:

Erró el Tribunal de Primera Instancia al declarar ha lugar la solicitud de supresión de evidencia de un material obtenido mediante una orden judicial de registro que cumple con todos los requisitos exigidos por nuestro ordenamiento.

Erró el Tribunal de Primera Instancia al concluir que es insuficiente lo incluido en la declaración jurada que dio base a la orden de registro y allanamiento expedida en este caso

Tras varios incidentes procesales, el 6 de marzo de 2026, emitimos *Resolución*[16] concediéndole a la parte recurrida hasta el 24 de marzo de 2026 para presentar su posición. El 25 de marzo de 2026, compareció la

---

[11] *Supra,* al Anejo 14-15.
[12] *Id.,* al Anejo 16.
[13] *Id.,* al Anejo 17.
[14] *Id.,* al Anejo 18.
[15] SUMAC TA, a la Entrada Núm. 1.
[16] SUMAC TA, a la Entrada Núm. 7.

parte recurrida mediante *Moción en Cumplimiento de Resolución*.[17] Contando con la comparecencia de las partes, procedemos a resolver.

II

A.

El auto de *certiorari* constituye un vehículo procesal discrecional que permite a un tribunal de mayor jerarquía revisar las determinaciones de un tribunal inferior. *IG Builders et al. v. BBVAPR*, 185 DPR 307, 337-38 (2012); *Pueblo v. Díaz de León*, 176 DPR 913, 917 (2009); *García v. Padró*, 165 DPR 324, 334 (2005). Sin embargo, esta discreción no se da en un vacío ni en ausencia de otros parámetros. *IG Builders et al. v. BBVAPR, supra*, a la pág. 337. Al respecto, para determinar si procede la expedición de un recurso de *certiorari* en el que se recurre de una resolución interlocutoria, esto debe evaluarse bajo los parámetros establecidos en la Regla 40 del Reglamento del Tribunal de Apelaciones, según enmendada, *In re Aprob. Enmdas. Reglamento TA*, 2025 TSPR 42, 215 DPR __ (2025) (Regla 40). Como es sabido, la Regla 40 esboza los siete criterios que este tribunal revisor toma en consideración al determinar la expedición o denegación de un auto de *certiorari*, a saber:

A. Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

B. Si la situación de hech0os planteada es la más indicada para el análisis del problema.

C. Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

D. Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

E. Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

F. Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

G. Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

---

[17] SUMAC TA, a la Entrada Núm. 12.

Los criterios antes transcritos nos sirven de guía para, de manera sabia y prudente, tomar la determinación de si procede o no intervenir en el caso en la etapa del procedimiento en que se encuentra. *Torres Martínez v. Torres Ghigliotty*, 175 DPR 83, 97 (2008). En ausencia de tal abuso o de acción prejuiciada, error o parcialidad, no corresponde intervenir con las determinaciones del Tribunal de Primera Instancia. *García v. Padró*, *supra*, a las págs. 334-335.

B.

La Constitución de Puerto Rico, en la Sección 10 del Art. II dispone que "[n]o se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables". Art. II, Sec. 10, Const. ELA, LPRA, Tomo I. Además, se dispone en la precitada sección que "[solo] se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse" y que la "[e]videncia obtenida en violación de esta sección será inadmisible en los tribunales". Art. II, Sección 10, *supra*; *Pueblo v. Ferreira Morales*, 147 DPR 238, 248 (1998).

Se trata de la protección constitucional contra registros, allanamientos e incautaciones irrazonables, sobre la cual se ha reiterado por el Tribunal Supremo que, al igual que su equivalente federal, tiene como objetivo básico "proteger el ámbito de intimidad y dignidad del individuo frente a actuaciones arbitrarias e irrazonables del Estado". *Pueblo v. Ferreira Morales*, *supra*, págs. 248-249, que cita a: *Pueblo v. Yip Berríos*, 142 DPR 386 (1997); *Pueblo v. Santiago Alicea I*, 138 DPR 230 (1995).

Ahora bien, la Regla 234 de Procedimiento Criminal, 34 LPRA Ap. II, R. 234, dispone lo siguiente:

> La persona agraviada por un allanamiento o registro ilegal **podrá solicitar del tribunal al cual se refiere la [r]egla [anterior] la supresión de cualquier evidencia obtenida en virtud de tal allanamiento o registro, o la devolución de la propiedad, por cualquiera de los siguientes fundamentos:**

(a) Que la propiedad fue ilegalmente ocupada sin orden de allanamiento o registro.

(b) Que la orden de allanamiento o registro es insuficiente de su propia faz.

(c) Que la propiedad ocupada o la persona o sitio registrado no corresponde a la descripción hecha en la orden de allanamiento o registro.

(d) Que no había causa probable para creer en la existencia de los fundamentos en que se basó la orden de allanamiento o registro.

(e) Que la orden de allanamiento fue librada o cumplimentada ilegalmente.

(f) **Que es insuficiente cualquier declaración jurada que sirvió de base a la expedición de la orden de allanamiento porque lo afirmado bajo juramento en la declaración es falso, total o parcialmente.** (Énfasis nuestro.)

"Por otro lado, **cuando el registro se efectúa al amparo de una orden judicial impera una presunción de legitimidad, pues toda determinación judicial se acompaña de una presunción de corrección.** En esos casos, el acusado tiene el peso de la prueba para rebatir la legalidad y razonabilidad de la actuación gubernamental". *Pueblo v. Nieves Hernández*, 174 DPR 877, 881 (2008).

Ante una moción de supresión bajo la Regla 234, le corresponde al Tribunal escuchar "prueba sobre cualquier cuestión de hecho necesaria para la resolución de la solicitud". 34 LPRA Ap. II, R. 234. En la eventualidad en que se declare "con lugar la moción, la propiedad será devuelta, si no hubiere fundamento legal que lo impidiere, y no será admisible en evidencia en ningún juicio o vista". *Id*.

La parte promovente de una moción de supresión de evidencia debe "exponer los hechos precisos o las razones específicas que sostengan el fundamento o fundamentos en que se basa la misma". *Pueblo v. Blase Vázquez*, 148 DPR 618, 628 (1999); 34 LPRA Ap. II, R. 234. Luego, "[e]l tribunal oirá prueba sobre cualquier cuestión de hecho necesaria para la resolución de la solicitud" y "tiene el poder para adjudicar credibilidad en dicha vista". 34 LPRA Ap. II, R. 234; *Pueblo v. Bonilla*, 120 DPR 92, 109 (1987). La Regla 234, *supra*, "es aplicable a toda vista de supresión que se celebre con el propósito de dilucidar la legalidad o razonabilidad de la

ocupación de evidencia por parte de agentes del orden público". *Pueblo v. Bonilla*, *supra*, a la pág. 110.

**C.**

Nuestra Constitución impone ciertas exigencias sustantivas y procesales contra los registros y allanamientos, las cuales se satisfacen a través de nuestras Reglas de Procedimiento Criminal, 34 LPRA Ap. II, R. 231. En particular, la Regla 231 de Procedimiento Criminal, establece lo siguiente:

> No se librará orden de allanamiento o registro sino en virtud de declaración escrita, prestada ante un magistrado bajo juramento o afirmación, que exponga los hechos que sirvan de fundamento para librarla. Si de la declaración jurada y del examen del declarante el magistrado quedare convencido de que existe causa probable para el allanamiento o registro, librará la orden en la cual se nombrarán o describirán con particularidad la persona o el lugar a ser registrado y las cosas o propiedad a ocuparse. La orden expresará los fundamentos habidos para expedirla, y los nombres de las personas en cuyas declaraciones juradas se basare. Ordenará al funcionario a quien fuere dirigida registre inmediatamente a la persona o sitio que en ella se indique, en busca de la propiedad especificada, y devuelva al magistrado la orden diligenciada, junto con la propiedad ocupada. *Id.*

De lo anterior se desprende que, para la liberación de una orden judicial de registro y allanamiento, se requiere: (1) una declaración bajo juramento o afirmación (2) en la que surja la causa probable; (3) que la orden sea librada por autoridad judicial; y (4) en ella se escriba el nombre o se describa con particularidad la persona o el lugar a ser registrado y las cosas o la propiedad a ocuparse. Además, la orden expresará: (1) los fundamentos para expedir; (2) el nombre de la persona declarante; (3) el decreto a un funcionario público para que registre inmediatamente la persona o el lugar que la orden indique para la búsqueda específica de la propiedad, la cosa o el objeto; (4) con el mandato para que el funcionario devuelva al magistrado el diligenciamiento de la orden con la propiedad ocupada y (5) dispondrá que el diligenciamiento se ejecutará durante el día a menos que, por necesidad y urgencia, el magistrado entienda que se haga en cualquier momento del día. *Pueblo v. Salamanca Corchado*, 210 DPR 582, 592-593 (2022).

En cuanto a la razonabilidad, este criterio no debe descansar "en meras sospechas, pero tampoco requiere que el juez quede convencido, fuera de duda razonable, que se está violando la ley, ni que se establezca que la ofensa que se imputa fue verdaderamente cometida". *Id.*, a las págs. 598-599. Basta con que el deponente entienda que se ha violado la ley en el lugar que habrá de ser registrado o allanado.

### III

En el caso de título, el Ministerio Público recurre de una determinación interlocutoria sobre supresión de evidencia. Tras haberse celebrado la correspondiente audiencia evidenciaría y evaluada la totalidad de las circunstancias, el foro primario determinó que la Declaración Jurada que sirvió de base para la expedición la Orden de Registro y/o Allanamiento fue insuficiente. Por consiguiente, suprimió cierta evidencia derivada de su diligenciamiento. Dado lo anterior, el peticionario señala que erró el Tribunal de Primera Instancia al declarar *Ha Lugar* la solicitud de supresión de evidencia de un material obtenido mediante una orden judicial de registro que, a su juicio, cumple con todos los requisitos exigidos por nuestro ordenamiento, y al concluir que es insuficiente lo incluido en la declaración jurada que dio base a la orden de registro y allanamiento expedida en este caso.

De un examen minucioso de los autos se desprende que el agente Sánchez Ramos, tanto en su testimonio como en la Declaración Jurada que dio pie a la expedición de la Orden de Registro y/o Allanamiento, manifestó que al aproximarse al vehículo para intervenir con la parte recurrida percibió un olor a marihuana. Tal circunstancia configura la causa probable necesaria para la expedición de la Orden de Registro, toda vez que le permitió albergar una creencia razonable de que en el vehículo se encontraba la sustancia controlada. Asimismo, el agente Albino Acosta, quien diligenció la Orden de Registro y Allanamiento, declaró que durante el registro percibió el mismo olor a marihuana proveniente del vehículo. Como es sabido, nuestro Tribunal Supremo ha expresado que un agente

del orden público puede llevar a cabo un registro sin la orden correspondiente en determinadas circunstancias, entre ellas, cuando el agente del orden público obtiene conocimiento de la existencia del material delictivo por el olfato. *Pueblo v. Báez López*, 189 DPR 918, 930-931 (2013). Por consiguiente, carece de razonabilidad concluir que la evidencia ocupada debe ser suprimida cuando fue obtenida al amparo de una Orden de Registro debidamente expedida y diligenciada, la cual se fundamentó en el mismo conocimiento sensorial que, por sí, habría justificado incluso un registro sin orden judicial.

Sin embargo, lo anterior fue descartado por el foro primario debido a que, una vez diligenciada la orden de registro, se ocupó en el vehículo la sustancia controlada conocida como *crack* en lugar de marihuana. El hecho de que la sustancia ocupada en el vehículo no coincidió exactamente con la descrita en la Orden no vicia el registro, pues se trata, en todo caso, de una sustancia controlada cuya posesión esta proscrita por ley.

Como norma general, los foros apelativos debemos abstenernos de intervenir con la apreciación de la prueba que realiza el Tribunal de Primera Instancia. *Pueblo v. Custodio Colón*, 192 DPR 567, 589 (2015). Sin embargo, nos corresponde alterar las determinaciones de dicho foro, cuando las mismas resulten arbitrarias o constituyan un craso abuso de discreción. *Pueblo v. Custodio Colón, supra*. Según vimos antes, en el ámbito del desempeño judicial, la discreción "'no significa poder para actuar en una forma u otra, haciendo abstracción del resto del [D]erecho'", ya que ciertamente, esto constituiría un abuso de discreción. *Bco. Popular de P.R. v. Mun. de Aguadilla*, 144 DPR 651, 658 (1997), que cita a *Pueblo v. Sánchez González*, 90 DPR 197, 211 (1964).

Reconocemos que, la determinación de credibilidad que hace el foro de instancia "es merecedora de gran deferencia por parte del tribunal apelativo, por cuanto es ese juzgador quien, de ordinario, está en mejor posición para aquilatar la prueba testifical desfilada ya que él fue quien oyó y vio declarar a los testigos". *Id*. No obstante, en el presente caso, luego

de evaluar la prueba ante nuestra consideración, resolvemos mediante los criterios de legalidad y razonabilidad ante las circunstancias del caso que, el Tribunal se excedió en el ejercicio de discreción bajo la regla 40 de nuestro reglamento y la jurisprudencia antes mencionada.

**IV**

Por los fundamentos expuestos, ***expedimos*** el auto de *certiorari* y ***revocamos*** el dictamen apelado.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones